BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, . Case Number 19-391-1

Plaintiff,

vs.

BRITTANY BAILEY, . Washington, D.C. October 8, 2019

Defendant.

- - - - - - - - - - - - - - - -

TRANSCRIPT OF BOND HEARING
BEFORE THE HONORABLE ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government: NICHOLAS MIRANDA, AUSA
United States Attorney's Office
555 Fourth Street Northwest
Washington, D.C. 20530

For the Defendant: KIRA WEST, ESQ.
Law Offices of Kira Anne West
1325 G Street Northwest
Suite 500
Washington, D.C. 20005

Transcriber: SARA A. WICK, RPR, CRR
333 Constitution Avenue Northwest
U.S. Courthouse, Room 4704-B
Washington, D.C. 20001
202-354-3284

Proceedings recorded by audio recording.
Transcript produced by audio transcription.

P R O C E E D I N G S

(Call to order of the court.)

THE COURTROOM DEPUTY: Your Honor, this is Magistrate Case Number 19-117-1, the United States of America versus Brittany Colleen Bailey.

Nicholas Miranda for the government; Kira West for the defendant; Christine Schuck on behalf of Pretrial Services. The defendant is present in the courtroom.

THE COURT: Thank you.

This is set for a hearing on Ms. Bailey's motion for bond. In a brief motion that was filed in September, Ms. Bailey through her counsel asked the Court to reconsider pretrial detention and set a release condition citing changed circumstances.

I will hear from you first, Ms. West.

MS. WEST: Thank you, Your Honor. As the Court mentioned, I did file a very, very brief reconsideration memo. And there's only two things that have changed, Your Honor.

THE COURT: Okay.

MS. WEST: The first one since you've seen and heard her first detention hearing was that her father, Mr. Keith Bailey, has reached out to me and said that he would provide a place for Ms. Bailey to live if this Court were, in fact, going to release her. That's an address in St. Louis, Missouri, which I understand Ms. Christine Schuck is here. She is the Pretrial

Services officer. We can give her that address, the phone number for her father so that she can speak with him and confirm all that for the Court. That's the first thing.

Secondly, since she's represented for the last several months Ms. Bailey, I know the Court will you remember her condition. She's in a wheelchair. And I just want to talk about what she has and what the situation currently is.

She is suffering something called dystonia, which was caused by a traumatic brain injury. She was seeing and has seen for 10 years a doctor who specializes in this, Dr. Reza, R-e-z-a, in Columbia, Missouri, at the Physical Medicine and Rehab Center, which is done through the University of Missouri. Through Dr. Reza's care, he was able to help Ms. Bailey regain her muscle control. In fact, just a couple weeks before she was arrested in this case, she was able to run a 5K.

After her arrest, she was not given her medicine at the D.C. jail since I've been here, but also not given her medicine when she was arrested in Missouri, which caused all those years of her getting back on her feet literally to her decline and being in a wheelchair.

I can attest and would swear to the Court two occasions that I've been to the D.C. jail to see Ms. Bailey, she's been incoherent, could not hold her head up, could not visit with me. And this isn't caused by Ms. Bailey. This is caused by the D.C. jail giving her incorrect medications, even though when I first

became her lawyer I specifically called the doctor at the D.C. jail, gave them a listing of her medications, and from what I understand, so did Ms. Bailey.

And I want to give the Court an example. Lidocaine with -- Ms. Bailey -- may I have a moment, Your Honor?

THE COURT: Uh-huh.

MS. WEST: She's currently been given a lidocaine patch, which I have here, and I could Xerox a copy of this and make it a part of the record as Defendant's Exhibit Number 1. She's supposed to have lidocaine with menthol. They're giving her the wrong stuff. They've given her magnesium oxide, which is for her muscles. She has a -- and I would like to use that as Exhibit Number 2. She was given this. It ran out yesterday. She's not going to see the doctor again until Thursday. These are the kind of issues that she's having.

They've overdosed her three to four -- several times. She's supposed to have 3 to 4 milligrams of tizanidine. I want to make sure I get this right. Okay. She's supposed to have 6 milligrams, and she was given double that amount, which is 12, and they gave it to her four days in a row.

Now, that may be why when I went to see her at the jail she was not able to communicate with me in a lucid fashion. She has been going up and down in her medicine. Today, I can tell the Court that she is able to communicate with me, and I don't know if it's because she's not getting the proper medication. I just

don't know because I haven't been able to get her medical records.

Now, early on, I went to see her a couple -- maybe six weeks ago. I would have to look at my file. And she was bruised heavily. She had fallen, hurt her ankle, her hand very badly. She was hospitalized for two weeks. They wouldn't tell me where she was for privacy concerns. I understand that.

So it's been difficult for me to communicate with her to get to the root of what her medical issue is specifically.

I just feel that -- I want to make sure also that pretrial has correct information with regard to where she would live at her father's house. There would not be children in the home. And I think that's very, very important because the government has said that she's a danger to the community. And I will wait until the government -- they have an additional -- I don't know if the Court has received the letter. So I will let the government speak to that, and I will have to ask the Court to speak again.

May I have one moment, Your Honor? I see my client wants to get my attention.

THE COURT: Yes.

(Pause.)

MS. WEST: I want the Court to know that I was in contact early with the head of the D.C. jail, a fellow named Eric Glover, because Maria Amato had left that position. And he

assured me that -- and he was very receptive, very good. He assured me that she would get the right medical treatment.

So when I saw her and she had fallen and she was all bruised, I asked her what the situation was, and she said, Well, they're supposed to be fitting me with a special orthotic so I can at least walk with a walker. And on 8/23 -- I would make this Defense Exhibit Number 3 -- a orthotic was fitted for her, ordered for her. And so today is about six weeks after this time, and she has not been provided with this orthotic.

I could go on and on about the list of things, but I just feel like when you take in conjunction the fact that she could live in a place, her own father would be responsible for her and getting her to her appointments at this specialized hospital for her brain injury, when you take that into consideration with the bad treatment that she is getting at the D.C. jail, I believe that a -- there are conditions, especially if we could use electronic monitoring or something like that, that would cause this Court to not have the concern that she would be a danger to the community, and certainly, she's not a risk of flight. I don't believe the government would even argue that.

So that's what we have for you this afternoon, Your Honor.

THE COURT: Thank you, Ms. West.

Mr. Miranda?

MR. MIRANDA: Thank you, Your Honor.

Just briefly, Your Honor. The defense counsel was

referring to a letter that the government received this morning from the father of one of Ms. Bailey's children that I did provide to both pretrial and to defense counsel, and I will pass a copy up.

THE COURT: Thank you.

MR. MIRANDA: Thank you. I should say this is verbatim with what I received this morning, except I edited out the full name of the children and inserted their initials. Otherwise, it is verbatim.

THE COURT: Thank you.

MR. MIRANDA: Your Honor, the government did file an opposition to the defendant's motion for bond. That's docket number 31. And I won't go through all of the arguments therein. I just wanted to highlight a couple of things very briefly.

The first is that the basis, the primary basis for the detention was the dangerousness that she presented to both the particular child involved in the evidence of the production of child pornography and also to children at large through the offense as elucidated in both the initial detention hearing, the decision, and in the opposition for the motion for bond. And nothing that the defense attorney has brought up today really goes to that particular issue of safety.

I understand and I am sympathetic to the defendant's health conditions. I think that those are issues that should be addressed and hopefully can be addressed, whether in the D.C.

jail or elsewhere. But that does not, in the government's view, go toward whether she presents a danger to society.

In this case, perhaps unlike some other types of violent crimes such as shootings or other such activities, the danger doesn't necessitate a high level of physical strength or something to that effect. Rather, the danger is born out by her actions online, in chat rooms, including but not limited to the fact that she was encouraging others and speaking to others about how she wanted them to sexually abuse her own children. She was taking a pornographic image of her own child. She was distributing child pornography. She was creating rooms to encourage the further distribution of child pornography, at least three additional chat rooms where she was controlling the membership therein.

All of these activities could be done in the same manner in her current physical state as they could have before. So her physical health, while unfortunate, is not something that negates the government's arguments and, I believe, the Court's conclusions regarding the level of dangerousness that she presents.

I will also point out that at least to some degree, these physical conditions, although not in the detail that the defendant's attorney points out, were both obvious from just being in the hearing and also were acknowledged in its analysis originally, which in particular I'm referring to docket number

26, the ruling, at 9, and were presented by defense counsel at the hearing. So I think that those have been, at least in large part, addressed.

And while defendant's counsel does point out the fact that there are other means in which she could be monitored, whether it's tracking or other measures like that, even if they were available at this particular location, which I don't think pretrial has explored because they didn't have the address, but even if, for the sake of argument, they were, as Your Honor is well aware, in a case like this, those types of measures are ill suited to prevent the dangerousness, because the dangerousness, as I argued, stems from the use of electronic media, and that's something that pretrial in this case and certainly in other cases has said that they don't have an effective ability to fully monitor and to prevent, and none of the other proposed conditions, whether it be electronic monitoring, would get to that ability to prevent the use of electronic media, especially given the ubiquity, the prevalence of the Internet and use of the Internet to commit these crimes.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Miranda.

Ms. West?

MS. WEST: Yes, Your Honor.

I failed to mention one thing. I have here, and I'm showing it to the government, a certificate from the D.C. jail

just to show the Court that while she's been incarcerated and she's been somewhat healthy, she's been able to complete her summer reading certificate from the D.C. public library, and she would avail herself of other things in the event that she could have good health.

So we will make that Defendant's Exhibit Number 4.

I think the Court knows that *United States v. Alatishe*, a case, D.C. Circuit case from 1985 wherein the D.C. Circuit said, "Determination that no conditions will reasonably assure defendant's appearance and safety of the community so as to justify pretrial detention without bail must be supported by clear and convincing evidence."

I don't believe the government has shown this Court that clear and convincing evidence that Ms. Bailey's a danger.

The letter that the government just referenced, which the Court just read and has a copy of, I think it's really important for the Court to know that -- I don't know that Dalton McNight wrote this letter. We haven't heard from Dalton McNight. The letter was e-mailed to the government by Mr. Dalton McNight's fiancee, whose name is Destiny, and she's the Miller Lite girl, from what I understand, is her employ.

Now, the reason I bring that up is because she says here that Ms. Bailey's father's character is, quote, not one that should be considered as a reliable conservatorship in monitoring of bond terms, end quote. She goes on to call him a

narcissistic sociopath. That's just out of bounds, I have to submit to the Court, and I think that that's a determination that Pretrial Services makes when they interview those people.

So I would just ask the Court to withhold ruling until Ms. Schuck can get with Mr. Keith Bailey, who would be the person who would keep charge of Ms. Bailey, and until she can interview him, know about his home conditions, speak with the pretrial people in Missouri -- I know that that's an extra level of work for her -- and confirm everything I've said today -- I've worked with her many times on many cases before -- about Ms. Bailey's doctors and the medications that she needs to have.

THE COURT: Ms. Schuck?

MS. SCHUCK: Good afternoon, Your Honor. Christine Schuck, Pretrial Services.

THE COURT: Good afternoon.

So in this afternoon's hearing, the defense has identified an individual named Keith Bailey, who is apparently Ms. Bailey's father, and the defense has asked if pretrial can verify his address.

Is that something that you would be in a position to do, and if so, how much time would it take you to do that? I know we're getting close to the afternoon calendar before Judge Robinson. So I don't know if it would be feasible for you to make calls this afternoon or not.

MS. SCHUCK: Well, I know we have tried in the past to

verify the address. As I was listening, I'm not sure which address, because the address we have -- when we conducted the pretrial interview, Ms. Bailey advised us she had a number of dependents and one lives with her, and she listed her father's address as the residence she lives at, which is going to raise a concern with Pretrial Services, as it appears there is a dependent in that house. And given the nature of this charge, pretrial's recommendation is still no combination of conditions can ensure the safety of the community and, obviously, risk of flight.

So our concern is, and I did speak to my supervisor prior to coming to court, the fact, based on our pretrial report and our pretrial interview, there is a dependent living in the residence, which is the father's residence, that's a concern for Pretrial Services regarding safety based on the nature of this charge.

If there is an alternate address, which I thought I heard referenced here in the hearing today, we need to know what that address is, because Pretrial Services out in Missouri has very specific guidelines for this type of charge as to Internet access, places that Ms. Bailey would be able to go. We would need to take that address, staff it with Pretrial Services out in Missouri to see if it's even an acceptable residence. And a lot of times, Pretrial Services agencies in other jurisdictions would like to do a home visit first.

If you're also looking at third-party custody and using Mr. Bailey as the custodian, we also need to do a background check on Mr. Bailey to see if he's a suitable third-party custodian.

So my office can accomplish these tasks. It will be done more than likely by someone else in my office because I will be appearing in mag court shortly.

MS. WEST: May I be heard briefly? It might help somewhat.

THE COURT: Yes.

MS. WEST: My understanding is that the pretrial people in Missouri, when Ms. Bailey was arrested there -- she wasn't arrested here, which I don't think I made that clear -- they've already done this address and background of her father. He lives on Patricia Court in St. Louis, Missouri. I don't know if they have that address in their paperwork.

And I spoke personally with Mr. Bailey on two occasions. He did not mention that there was a dependent in the home, and I specifically asked where he lived and if he would be willing to keep Ms. Bailey. Actually, he reached out to me and said that he would.

So I'm a little concerned and confused about what I'm hearing from pretrial. So I think that we at least should have our facts straight before the Court makes a decision.

THE COURT: Is that address that Ms. West has

mentioned different from the address that you have in your files?

MS. SCHUCK: No, the Patrina Court is what we have. I can only go by what was told to us when we interviewed Ms. Bailey. When we asked about number of dependents, we were told two, number who lived with her, one, and given the father's address. So that's what we have to go by.

THE COURT: If I were to pass this case until 2:30, would that allow time for someone in pretrial to reach out to maybe the other pretrial to see if they've already verified the address or, if not, to reach out to Mr. Bailey to ask the question directly about whether there's a dependent?

Obviously, home visit and all that would be a far more involved process, and I don't want to -- at this time I don't have information that would make me inclined to ask for that level of investigation and resources to be committed by pretrial, but I would like to know if this address that's being proposed by the defense has been verified and whether there's a child who lives at that address.

MS. SCHUCK: We just need to confirm. My office can do this which Your Honor is requesting. We just need to confirm the exact address that is going to be, and then we will reach out and make the appropriate phone calls.

THE COURT: Okay. Thank you.

And counsel, are you available at 2:30?

MS. WEST: Yes, Your Honor.

MR. MIRANDA: Yes, Your Honor.

THE COURT: Okay. I will pass this case until 2:30 to allow pretrial to further investigate the proposed address.

And Ms. West, if he could just confirm the specific address that you are requesting with Ms. Schuck.

MS. WEST: Yes, Your Honor.

THE COURT: Thank you.

MR. MIRANDA: Thank you, Your Honor.

(Recess taken.)

THE COURTROOM DEPUTY: Your Honor, this is Magistrate Case Number 19-117-1, the United States of America versus Brittany Colleen Bailey.

Nicholas Miranda for the government; Kira West for the defense; Christine Schuck on behalf of Pretrial Services. The defendant is present in the courtroom.

THE COURT: Thank you.

Ms. Schuck, during the break, was pretrial able to find out whether Ms. Bailey's father does live at the address specified and whether there's a minor at that address?

MS. SCHUCK: No, Your Honor. We actually made a -- we made attempts to reach Mr. Bailey. I personally tried at 1:18 p.m. The call went right to voicemail. Mr. Sidbury tried again at 2:02 and 2:26 p.m., again unable to reach him and went to voicemail.

We did speak to U.S. Pretrial Services in St. Louis, Missouri. We actually spoke to the supervisor. The supervisor advised us they did not verify her address. There's no record in their system of that office verifying the address.

THE COURT: Okay.

MS. SCHUCK: That was per Supervisor Irvey.

THE COURT: Thank you, Ms. Schuck.

Did the defense or the government wish to make any further arguments before I make a decision?

MS. WEST: Yes, Your Honor.

I believe the reason pretrial can't get ahold of Mr. Bailey is, of course, because it's during the work hours. So I would only ask the Court to, perhaps, give us 24 hours for pretrial -- for him to call pretrial, at least that's what I'm going to try to do, is call him after 5:00, have him call pretrial, give him Ms. Schuck's phone number so he can confirm his address, and then we could go from there.

I would hope that we wouldn't have to have another hearing. Let's say, for example, today she was able to speak to him. She could say yes, this is the address. I don't know what their next steps would be, but it could be that the Court could make a decision without us having another hearing if that happened.

And the only other thing I had, Your Honor, was I marked our four exhibits for the Court, and may I hand them to the clerk?

THE COURT: Yes. Thank you. Thank you for making copies.

MS. WEST: And I showed them to the government.

THE COURT: Thank you. Just for clarity, these are copies of the medications that you showed me earlier today?

MS. WEST: Yes.

THE COURT: The prescriptions --

MS. WEST: And the one class that she was able to complete with the library.

THE COURT: Thank you.

MS. WEST: Uh-huh. So we would just ask the Court to defer ruling on this hearing issue. Even though pretrial gave it a really good try, I think that we -- I don't think it would be hard to wait for another 24 hours to see if we can confirm that address.

THE COURT: Thank you.

Mr. Miranda, do you have any objections to the defense's request that I defer ruling for 24 hours?

MR. MIRANDA: No, Your Honor, except I will just point out to the Court that if Your Honor is inclined to have a hearing in which the ruling is presented, the government is not available before 2:00.

THE COURT: Okay. Thank you.

MS. WEST: I have an oral argument at 1:30, and it will probably last until 2:30. So I could be available at 2:30

tomorrow, if the Court wanted to here from us.

THE COURT: Are counsel available at 3:00 tomorrow?

MS. WEST: Absolutely.

MR. MIRANDA: Your Honor, I have a plea being taken by Magistrate Judge Robinson at 2:45. So I don't know what time that would be over or how long the rest of her docket is going to be tomorrow.

THE COURT: And you said you were not available before 2:00?

MR. MIRANDA: No, I can move things around and make myself available.

THE COURT: Let's see. Your plea is at 2:45?

MR. MIRANDA: It is, Your Honor.

MS. WEST: Maybe we can be here at 2:30.

THE COURT: Right. I don't think it will take very long. Is 2:30 available to you, Ms. Schuck? It wouldn't have to be you. It could be someone else from pretrial. Is pretrial available at 2:30?

MS. SCHUCK: Pretrial is available at 2:30.

THE COURT: I will continue this hearing until 2:30 p.m. tomorrow, at which time I will make a ruling and at which time hopefully we will have some additional information about whether that address could be verified.

MS. WEST: Yes, Your Honor.

THE COURT: And Ms. Bailey will continue to be held in

the interim. That concludes this matter.

(Proceedings adjourned.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CERTIFICATE OF TRANSCRIBER

I, Sara A. Wick, certify that the foregoing is a true and correct transcript, to the best of my ability, from the audio-recorded proceedings in this matter.

/s/ Sara A. Wick — January 3, 2020

SIGNATURE OF TRANSCRIBER — DATE